IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

CARLA CHILDS, as Special Administrator )
Of the Estate of Ethel Kirk, and on behalf )
Of Herself and Others Similarly Situated, )
)
    Plaintiffs, )
)
v. ) Case No. 10-CV-23-PJC
)
UNITED LIFE INSURANCE COMPANY, )
and MOBILECARE 2U, LLC., )
)
    Defendants. )

## OPINION AND ORDER

Before the Court is the parties' Joint Motion to Certify Class Approval of Settlement Based on Amendment to Settlement Agreement [Dkt. No. 151].[1] Because of its concerns about the Notice that has been provided to potential class members in this matter, the Court directs that new Notice be provided to class members in order to ensure that the "best notice practicable under the circumstances" has been provided. Fed. R. Civ. P. 23(c)(2). The Court will render its decision on the pending motion once this new Notice process has been completed.

I
Background

This is a class action under Fed. R. Civ. P. 23 on behalf of (1) Oklahoma nursing home residents, (2) receiving Medicaid assistance from the State of Oklahoma, (3) eligible for denture-related services under Oklahoma Medicaid provisions, and (4) who

---

[1] The Parties have consented to jurisdiction before a U.S. Magistrate Judge, and on Oct. 13, 2011, the case was referred to the undersigned. [Dkt. No. 126].

1

purchased out of their own funds policies of dental insurance ("the Dental Plan") sold directly to them by Defendants. Plaintiffs contend that the Dental Plan is unlawful for several reasons: First, Plaintiffs assert that denture-related services are "routine services" under the Oklahoma Medicaid provisions and can be paid for only out of the nursing home's "daily rate for routine services." Selling the Dental Plan directly to the nursing home residents is unlawful, according to Plaintiffs. Second, the Dental Plan premiums are not collected from a nursing home's daily rate for routine services but from the nursing home residents' personal funds. Finally, Plaintiffs assert that the Dental Plan unlawfully contains per-procedure benefit caps and co-payments relating to participating and non-participating dentists. First Amended Complaint, Dkt. No. 81 at ¶¶ 20-23.

On Oct. 11, 2011, the Parties filed a *Joint Motion for Class Certification and Approval of Settlement, and for an Order Preliminarily Certifying Settlement Class, Preliminarily Approving Settlement Agreement, Approving Form of Notice to Class Members, and Setting Date for Settlement Fairness Hearing* ("the Joint Motion"). [Dkt. No. 121]. At a hearing on Nov. 18, 2011, the Court expressed concerns with the proposed settlement terms and on Nov. 28, 2011, the Parties submitted substitute settlement documents addressing those concerns. [Dkt. Nos. 132, 133]. The amended Settlement Agreement contains the following provisions:

- Establishment of a $900,000.00 settlement fund;
- Payment of $225,000.00 to Plaintiffs' counsel without objection by Defendants;
- Payment of $15,000.00 for Plaintiffs' expenses

2

- Payment of $10,000.00 to Lead Plaintiff Carla Childs as an incentive award;
- Permanent injunction against sale of the subject dental policies in Oklahoma;
- Establishment of a *Cy Pres* charitable fund with Salvation Army – Bartlesville Corps. to be used in its "Sonshine Seniors" program;
- Payment of valid claims[2];
- A "flow through" or reversion provision by which any funds not paid for fees, expenses, and claims will revert to Defendants.

[*See* Dkt. No. 121-1 & Dkt. No. 151, Exhibit "1"].

In its *Opinion and Order* of Dec. 2, 2011, [Dkt. No. 134], the Court granted the Joint Motion and approved the manner and method of class notice proposed therein. The Court also preliminarily approved the requested fee of Plaintiffs' counsel, the request for Plaintiffs' cost reimbursement and a $10,000 incentive award to Ms. Childs.

The Joint Motion provided a Plan of Notice for Class members. The Settlement Agreement provides:

Plan of Notice. "Plan of Notice" means the following plan for providing notice to Class Members:

(a) Direct Mail Notice:

The Notice of Settlement will be sent by first class mail to all Class Members for whom a mailing address is available to the Defendants.

(b) Published Notice:

The abbreviated Notice of Settlement described in paragraph 2.4 will be published once a week for not less than two consecutive weeks in the Daily Oklahoman and the Tulsa World.

Settlement Agreement, [Dkt. No. 121-1, ¶ 1.30].

---

[2] The latest estimate is that there are 167 valid claims totaling $153,539.24.

Defendant Unified Life Insurance Co. ("Unified") retained Jeffrey D. Dahl of Dahl Administration LLC to serve as Settlement Administrator in this matter. Dahl oversaw preparation of the Notice Mailing List, Notice Packet mailing, processing of returned Notice Packets, Reminder Letter mailing, processing of Requests for Exclusion and Objections, and Claim Form receipt and award calculation. [First Affidavit of Jeffrey D. Dahl ("Dahl Aff. I")Dkt. No. 151-2, ¶ 3].

On December 16, 2011, Notice Packets were sent to 1,798 potential Class Members. [*Id.* at ¶ 6]. However, more than 1,500 of these Notices -- 86 percent – were sent in bulk packages to 49 nursing home/care facilities. [Second Affidavit of Jeffrey D. Dahl ("Dahl Aff. II") Dkt. No. 153 at ¶ 4].[3]

Of the total Notice Packets mailed, 361 were returned by the postal service undelivered. [Dkt. No. 151-2, ¶ 7]. Eighteen of this group had forwarding addresses and Notices were re-mailed.[4] The remaining 343 were sent to an address search firm for tracing, which resulted in new addresses being located for 244 class members and

---

[3] Dahl had determined that many Class Members had the same last known address – generally, a nursing home or other such facility. Dahl consulted with counsel for all parties and it was agreed that with respect to facilities shown as the last known address of 10 or more Class Members, Notice Packets would be sent in bulk. This meant that one large envelope containing all of the individually addressed Notice Packets would be mailed to the manager of the nursing home, rather than mailing them directly to the individual Class Members. Nursing homes in this category (hereafter, "the large facilities") had anywhere from 10 (e.g. Broadway Manor, Muskogee, Okla.) to as many as 90 (e.g. Grace Living Center, Jenks, Okla.) Class Members shown as living there. [Ex. 6-A provided to the Court at a hearing held on March 27, 2012. Dkt. No. 152].

[4] Dahl's March 19, 2012, Affidavit states that 18 were returned by the postal service with forwarding addresses. [Dkt. No. 151-2, ¶ 7]. Dahl's April 6, 2012, Affidavit states that 16 Notices were returned with a forwarding address. [Dkt. No. 153, ¶ 6].

4

Notices being sent to those new addresses. [Dahl Aff. I, Dkt. No. 151-2 at ¶¶ 6-7]. Dahl states that the percentage of Class Members who received Notice packets is calculated at 94.8 percent. [Dkt. No. 153, ¶ 12].

Dahl has submitted extensive documentation showing the mailings to various nursing home facilities, packets returned undelivered, Class Members who opted out of the settlement, and Class Members who have filed claims. The latest data indicates that 167 class members have submitted claims and that total payout will be $153,539.24.

## II
## Applicable Standard

Rule 23(c)(2)(A) requires that notice be given to class members as follows:

*For (b)(1) or (b)(2) Classes.* For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class.

*For (b)(3) Classes.* For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.

The Court previously indicated that it expected the parties to serve Notice to Class Members in compliance with Rule 23(c)'s "best notice that is practicable" standard. [Dkt. No. 134 at 9]. This requires notice that is "reasonably calculated under all the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Phillips Petroleum Co. v. Shutt*, 472 U.S. 797, 812 (1985) (*quoting Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)). The U.S. Supreme Court has stated that Rule 23(c)(2) provides an "unambiguous requirement" that "individual notice must be provided to those class

5

members who are identifiable through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 & 176 (1974); *Gottlieb v. Wiles*, 11 F.3d 1004, 1013 (10th Cir. 1993), *abrogated on other grounds by Devlin v. Scardelletti*, 536 U.S. 1, 6 (2002).

## III
## Discussion

The law is clear that individual notice sent by first-class mail is sufficient to satisfy the notice requirements of due process. Indeed, the U.S. Supreme Court has stated that best notice practicable means that "Individual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort." *Eisen*, 417 U.S. at 173; *Phillips Petroleum Co.*, 472 U.S. at 812.

### A. Bulk Mailing Individual Notice

Can "individual notice" be sent by bulk envelope, as was done here? In *Barone v. Safway Steel Products, Inc.*, 2005 WL 2009882 (E.D.N.Y. Aug. 23, 2005), the Court discussed the notice necessary to satisfy Rule 23(c)(2)(B). The Court relied on *Eisen*, and concluded that since there were only approximately 50 class members and that these could be identified through reasonable effort, "individual notice of the class action *must be mailed to each*." *Id.* at *6 (emphasis added). Here, although the number of Class Members is significantly larger, Defendants can readily provide the names and last known billing addresses of all Class Members. Under the circumstances, there is no reason to rely on nursing home managers to effect individual notice. The risk of non-delivery is simply too great and once the bulk envelopes are delivered to a nursing home, there is no way of determining whether the notice was *actually* delivered to the

6

individual Class Member.  The bulk envelope would not be returned undelivered if the *nursing home* received the envelope, regardless of whether the Class Members residing there ever received their Notice Packets.

The data submitted by Dahl supports the Court's concern.  The overall claims filing rate based on the mailings to all 1,798 Class Members is 9.3 percent.  [Dkt. No. 151-2 at ¶ 12].  For more than 1,500 Class Members their last known address was one of the large facilities.  For these large facilities, the claims rate drops to 4 percent.  More significant, however, is the fact that nine of the large facilities accounted for all of these claims.  The remaining 39 large facilities produced no claims or objections.  A significant number of the facilities with zero claims housed 50 or more Class Members.  For example:

| Facility | Class Members | Claims | % |
|---|---|---|---|
| Grace Living Ctr. | 91 | 0 | 0 |
| So. Park | 85 | 0 | 0 |
| Maplewood Care | 78 | 0 | 0 |
| Rosewood Terr. | 67 | 0 | 0 |
| Green Country Care | 62 | 0 | 0 |
| Gatesway (2 locations) | 62 | 0 | 0 |
| Tulsa Nursing Center | 53 | 0 | 0 |

By way of comparison, other large facilities had above average claim rates:

| Facility | Class Members | Claims | % |
|---|---|---|---|
| Wagoner | 27 | 11 | 41 |
| Ponca City | 54 | 12 | 22 |
| Parks Edge | 54 | 6 | 11 |
| Woodland | 64 | 10 | 16 |

(These numbers have been taken from the exhibits submitted by Dahl and collectively provided to the Court as Exhibit 6 at the March 27, 2012, hearing.)  These numbers

7

heighten the Court's concern that at many of the large nursing home facilities individually addressed Notice Packets were not properly distributed.

The mailing of Notice Packets in bulk to these 49 care facilities does not comport with due process because there is no evidence that the potential Class Members ever actually received their packets. Dahl assumed that because these bulk packets were not returned as undeliverable that the Notice Packets therein actually reached their intended target. Thus, he calculated that 94.8 percent of all Class Members received their Notice Packets. But this number is highly suspect. It is possible that as many as 1,247 Class Members in large facilities never received their Notice Packets.[5] If so, this drops the percentage of Notice Packets delivered to slightly more than 25 percent.

The "bulk notice" sent to the large facilities (10 or more Class Members) does not comport with either the "best notice practicable" standard of Rule 23(c) or the Plan of Notice approved by the Court. The Court approved Class Notice as outlined in the Plan of Notice set forth in the Parties' Settlement Agreement. Pursuant to that plan, Class Members were to receive "direct mail notice" where possible. Notice Packets were to be sent "by first class mail to all Class Members for whom a mailing address is available to Defendants." [Dkt. No. 121-1 at ¶ 1.30(a)].

Here, most of the Notice Packets were not sent <u>directly</u> to Class Members. For Class Members whose last known address was one of the large facilities, Notice Packets were sent directly to the nursing home, not the Class Member. For more than 1,500 of

---

[5] This is based on the fact that 1,247 Class Members believed residing in 39 of the large facilities made no claims or objections to the proposed settlement.

8

the 1,798 Class Members, an individual addressed Notice Packet was placed in a bulk envelope and addressed to the Manager of their nursing home. Dahl assumes that if these bulk envelopes were not returned undelivered, the Class Members received their notice. But when counsel was asked at the March 27, 2012 hearing what assurance there was that the Notice Packets mailed in bulk had *actually* been given to the large facilities' Class Members, the response was that the nursing home Manager "probably had a fiduciary duty" to ensure delivery. This provides little comfort to the Court.

To understand the Court's concerns about the form of notice provided in this case, it is necessary to review two aspects of the proposed settlement. First, the attorney fee paid to Plaintiffs' counsel is based on a percentage of the total Settlement Fund established to pay claims; that is, Plaintiffs' Counsel's financial interests are "decoupled" from those of the Class Members. Thus, there is no financial incentive for Plaintiffs' Counsel to seek as many Class Members as possible. *See* William D. Henderson, *Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements*, 77 Tul. L. Rev. 813, 825 (2003). Second, the "flow through" or reversion provision in the Settlement Agreement provides that whatever portion of the Settlement Fund remains after all fees, expenses, *Cy Pres* fund, and claims are paid will be returned to the Defendants. This effectively creates a financial *disincentive* on the Defendants' part to seek out Class Members and pay claims. In highlighting these provisions, the Court is not implying that counsel for any party to this action has acted improperly in any way. However these observations underscore the fact that the Court must pay

9

special attention to ensure that all possible Claimants have been properly notified and given an opportunity to file claims.[6]

B. **Notice to Estates of Deceased Class Members**

The Court also notes that Dahl sent Notice Packets to 498 deceased Class Members by addressing the envelope to "Estate of _____" and mailing it to the last known nursing home address for that individual. Many of these mailings were included in bulk envelopes to the large facilities. For example, of the 91 Class Members whose last known address was Grace Living Center, 36 were deceased. Thus, these 36 envelopes were addressed to "Estate of _____" and mailed in a single large envelope to the Manager of Grace Living Center. No one filed a claim on behalf of the 36 deceased individuals. Indeed, no claims were received from Grace Living Center Class Members at all. From these 498 "Estate of" Notice Packets, only one claim was received.[7]

The Court also concludes that this manner of informing heirs of deceased Class Members is inadequate.

---

[6] Class action settlements including reversion provisions are not inherently unfair. *See, e.g., Navarro v. Servisair*, 2010 WL 1729538, at *1 (N.D.Cal. April 27, 2010). *See also* Herbert B. Newberg & Alba Conte, 3 Newberg on Class Actions § 10:15 (4th ed. 2010). Nevertheless, some courts have refused to enforce such agreements, finding that the combination of a reversion clause and a "clear sailing" provision as to attorney fees rendered the agreement presumptively collusive. *E.g., Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 45 (D.Me. 2005).

[7] "Estate of Nettie Heard" is listed twice on Dahl's list of claimants. [Ex. 6-E from the March 27 hearing]. Heard was not reported as living in a nursing home. Her Notice Packet was sent to a private address in Bixby, Oklahoma.

# V
# Conclusion

The Court finds that the Notice afforded to Class Members has been flawed and does not meet the requirements of Rule 23. Since the initial Settlement Agreement has been amended, a question arises whether new notice must be given to Class Members concerning the amended proposal. Courts have held that where amendments to a proposed settlement expand or improve rights for the class, new notice may not be required. *In re Integra Realty Resources, Inc.*, 262 F.3d 1089, 1111 (10th Cir. 2001) ("In this case, the addition of opt-out rights merely expanded the rights of class members…. Accordingly, we hold the district court did not abuse its discretion by failing to notify class members of their opt-out rights prior to conducting a fairness hearing of the settlement's terms."); *Manners v. American General Life Ins. Co.*, 1999 WL 33581944, at *13 (M.D.Tenn. Aug. 11, 1999) ("Because these amendments enhance the relief provided to Class Members, the Court finds that additional notice was not and is not necessary.").

Similarly, here the amendments to the original settlement agreements provide enhanced relief for the Class Members: Class members with valid claims will be reimbursed 100 percent of their premiums, rather than 50 percent. A *Cy pres* charitable fund will be established to provide additional benefits to Class Members. Nevertheless, under the circumstances presented here and the flaws in the original notice, the Court finds that additional notice must be given.

Accordingly, Counsel shall develop a plan for new notice to Class Members. While the details of the plan are left to counsel, counsel should consider: The plan must

provide for individual, direct mail to Class Members. The plan must include a methodology for attempting to find the representatives of the estates of those Class Members who have died. This may require direct telephone communication with the nursing homes involved to obtain information or use of on-line databases. *E.g., Nilsen v. York County*, 382 F. Supp. 2d 206, 210-12 (D.Me. 2005). Since the vast majority of Class Members are from the eastern part of the state, counsel may wish to consider use of radio advertising, press releases or advertising in smaller newspapers in that area.

The revised plan shall be submitted to the Court by June 4, 2012. A hearing will be held on June 8, 2012 at 10 a.m. on approval or modification of the notice plan.

**IT IS SO ORDERED** this 21st day of May 2012.

_____
Paul J. Cleary
United States Magistrate Judge